**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
Case No.

APRICUS GENERATION, INC.

      Plaintiff,

v.

KEITH SANDOR,

      Defendant.

_____/

## COMPLAINT

Apricus Generation, Inc. ("Apricus") sues Defendant Keith Sandor ("Sandor"), and states:

### INTRODUCTION

This case is about a CEO who lied for personal gain. Keith Sandor wanted Apricus to invest in his solar and energy storage company, Nexus Renewables, Inc. ("Nexus"). As a significant shareholder of Nexus, Sandor stood to reap a substantial benefit if Apricus made a significant equity investment in Nexus.

To induce Apricus to invest, Sandor knowingly misrepresented material facts throughout months of due diligence, intending Apricus to rely on those falsehoods in proceeding with its planned investment. He claimed Nexus' "crown jewel" energy project was already "in construction" and would be operational the month after Apricus would close its investment. He assured Apricus that this project alone would generate $2.8 million in annual EBITDA. When Apricus requested his employment agreements, Sandor created and backdated documents that appeared legitimate to mislead Apricus into believing that those employment arrangements had been approved by the board of Nexus. Apricus relied on those assurances and invested more than $21 million to acquire control of Nexus through a planned two-step stock purchase. This phased

4902-2557-1200

investment structure was central to Apricus' acquisition strategy and known to Sandor during due diligence.

The reality was stark. Construction on Nexus' flagship project (the Amcor Project) had not begun. Nexus lacked even the permits and lease required to start. In fact, critical equipment that requires long lead time to replace had been damaged and rendered inoperable, and Nexus was already in dispute with its Engineering, Procurement and Construction ("EPC") contractor. Sandor inflated the EBITDA projections by almost forty percent based on regulatory approvals he knew to be impossible. Sandor orchestrated this scheme for his own financial benefit.

Nexus' board ultimately launched an investigation and terminated Sandor for cause. Apricus now brings this action against Sandor personally—for fraud, negligent misrepresentation, and fraudulent concealment—because his deception induced a transaction Apricus would never have undertaken had Sandor not intentionally masked it.

## THE PARTIES

1. Apricus builds nationally distributed solar and battery energy storage developments and operates as an independent power producer. Apricus' founders have a proven track record of taking projects from conception to operation and brings deep industry experience in navigating complex financing structures, regulatory frameworks, and technical challenges inherent in the energy sector.

2. Apricus grows through acquisition. It identifies project developers in need of capital or management expertise and integrates those developers into its holding company.

3. Apricus is led by its co-founder and chief executive officer, Ravi Thuraisingham, a nuclear engineer and CFA charterholder with nearly three decades of experience in the energy industry. Thuraisingham has served as Chief Energy Officer, Chief Executive Officer, Chief Financial Officer, and President of multiple energy companies before co-founding Apricus.

2

4902-2557-1200

4.     Non-party Nexus is a developer, owner, and operator of renewable energy infrastructure projects and an independent power producer. Although headquartered in Toronto, Canada, Nexus develops renewable energy projects entirely in the United States, including projects in New York, California, Texas, Illinois, Minnesota, and New England. As is relevant here, Nexus' flagship energy project was to be located in California.

5.     Nexus operates through a network of U.S. subsidiaries. Nexus wholly owns all shares of Nexus Renewables U.S. Inc. ("Nexus U.S.") and NRI U.S. InvestCo, LLC, both Delaware corporations. Through these two U.S. subsidiaries, Nexus holds its project-level assets across seventeen additional subsidiaries—all of which are Delaware limited liability companies.

6.     Sandor is the founder and former CEO and board member of Nexus and President of all 19 U.S. subsidiaries mentioned above. Sandor was a significant shareholder of Nexus.

7.     Sandor served as Apricus' and Thuraisingham's primary point of contact throughout the due diligence process. He controlled the information that was (and was not) provided to Apricus. Although based in Toronto, Sandor's role as founder and CEO centered on Nexus' U.S. energy projects and involved responsibility for financing, regulatory approvals, construction, and operation of Nexus' U.S. portfolio. Sandor traveled to and met with Apricus' leadership team, including Thuraisingham, in the U.S. to discuss Apricus' potential acquisition of Nexus.

## **JURISDICTION AND VENUE**

8.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different countries. Apricus is incorporated in Delaware and maintains its principal place of business in Boca Raton, Florida. Sandor is a citizen of Canada.

4902-2557-1200

9. This Court has personal jurisdiction over Sandor pursuant to Fed. R. Civ. P. 4(k)(1)(A) and Fla. Stat. § 48.193(1)(a)(2). Sandor purposefully directed his fraudulent conduct toward Florida and committed tortious acts within this state. Among other things:

- Sandor served as Apricus', and specifically Thuraisingham's, primary point of contact throughout the due diligence process. Sandor knew that Apricus and Thuraisingham maintained their principal place of business in Florida.

- From September 2023 to May 2024 Sandor engaged in nearly 20 communications—by telephone or videoconference—with Thuraisingham while Thuraisingham was in Florida. Sandor knew Thuraisingham was located in Florida during these conversations. These communications included material misrepresentations regarding Nexus' project portfolio and EBITDA projections.

- Sandor knew Apricus' primary place of business and operations were in Florida and intended that Apricus would receive his statements and rely on them in Florida when deciding whether and how much to invest in Nexus.

- Apricus relied on the misrepresentations it received from Sandor in Florida.

- Sandor's representations about Nexus induced Apricus to purchase a majority stake in Nexus. Thuraisingham executed all acquisition agreements related to those transactions on behalf of Apricus in Florida.

- Because Apricus operates and its principal place of business is in Florida, the losses and injuries suffered as a result of the Nexus acquisition occurred and were felt in Florida.

10. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this

4

district. Sandor directed his misrepresentations into this district and Apricus sustained harm in this district as a result of Sandor's conduct. Apricus' investment decisions were made in this district, making this district the center of gravity for the harm alleged. The harm occurred here.

<b><u>FACTUAL ALLEGATIONS</u></b>

**A.     Nexus' Amcor Project and Its Failures**

11.     The Amcor Project was the centerpiece of Nexus' energy project portfolio—the "crown jewel" Sandor touted to Apricus. Nexus planned to develop, construct, and operate a battery energy storage system ("BESS") in Fairfield, California, on land leased from Amcor Rigid, a global packaging company. The Amcor Project carried an estimated construction cost of $27 million. Financing reflected the Project's scale. Nexus intended to fund construction through a complex structure involving $11 million in tax equity from Greenprint Capital, $14.5 million in debt from Synovus Bank, $13 million in debt from AIGA Capital Partners, and $3.7 million in equity from Nexus.

12.     As complex as the financing and construction would be, Sandor advertised the Amcor Project as a revenue and profit generator. Sandor quantified the Amcor Project's projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $2.8 million per year and leveraged cash flows of $1.5 million per year. Sandor represented that the Amcor Project would have two streams of revenue. (1) Twenty-five percent of revenue would come from private energy servicing contracts with the lessor (Amcor Rigid) and an energy community choice aggregation program. (2) Seventy-five percent of revenue would come from participation in the wholesale energy market regulated by California Independent System Operator ("CAISO").

13.     Nexus entered into a series of contracts in connection with the Amcor Project. Nexus contracted with its lessor and community choice aggregation program to secure the first stream of revenue. Nexus entered into separate project financing agreements with Greenprint,

5

4902-2557-1200

Synovus, and AIGA, securing nearly $40 million in investments for the Amcor Project. Nexus subcontracted the engineering, procurement, and construction aspects of the Project to SunGrid.

14.     Despite its promised potential, the Amcor Project was riddled with issues from the start. For example, initially, the projected revenue streams looked different. In December 2020, Nexus entered into an agreement with Pacific Gas & Energy ("PG&E"), California's leading energy provider for commercial operation of the Amcor Project. Then as planned, the Amcor Project's revenue stream would derive (not from merchants with CAISO, but instead) from the contracted relationship with PG&E, a more stable source of income.

15.     But Nexus was unable to satisfy the project milestones established in the PG&E contract, which ultimately led PG&E to terminate the agreement. For example, Nexus failed to post the required development security with PG&E, prompting PG&E to send an early termination notice on March 11, 2022. Nexus negotiated with PG&E to forestall termination and amend the initial contract by reducing the capacity of the Amcor Project and delaying the expected operational date in exchange for a $600,000 payment in November 2022. But Nexus then failed to meet its contractual milestones again, and PG&E terminated the contract on December 5, 2022, retaining Nexus' $600,000 as a penalty payment.[1]

16.     Losing PG&E gutted the Amcor Project's financial foundation because PG&E was originally the cornerstone of Nexus' EBITDA model. Internally, Nexus employees recognized the risk. One employee resigned, citing in his resignation letter to Sandor a "lack of confidence in the [Amcor Project] given the economics, customer, status, etc. and subsequently corporate funding [creating] … tremendous amount of real risks that could drag Nexus' finite resource."[2] This

---

[1] Attached hereto as Exhibit #1 is the PG&E Termination Notice.
[2] Attached hereto as Exhibit #2 is the Resignation Letter.

6

4902-2557-1200

resignation underscored what Sandor already knew: without PG&E, the Amcor Project was no longer viable under its original assumptions.

17. Rather than disclose PG&E's termination, Sandor deliberately concealed it from Nexus' board and investors, knowing the truth would undermine Nexus' valuation and hurt Sandor's personal stake in Nexus. Not wanting anyone to know that PG&E had terminated the contract, Sandor falsely portrayed the shift away from PG&E as a strategic decision by Nexus' board. In reality, the board had not issued any directive to abandon PG&E or pursue merchant-based income and, upon information and belief, did not even know PG&E had terminated its agreement with Nexus as of January 2023.

18. One month after PG&E's termination, Sandor told Project investor Greenprint that Nexus' "Investment Committee had asked us to" consider "monetization of merchant Resource Adequacy revenues in place of PG&E contracted revenues." No such committee existed, and Sandor omitted any mention of PG&E's termination. Ten days later, Sandor provided Greenprint with merchant revenue forecasts and spun them as an improvement over PG&E's contract that Nexus should seize. When Greenprint asked about penalties for terminating the PG&E agreement, Sandor claimed they were "$600,000"—the amount Nexus had already forfeited for failing to meet performance milestones.

19. Without a response from Greenprint, Sandor followed up five days later, asserting there was an "upcoming board meeting" and pressing for feedback because the "board has been kept apprised of the operational and financial considerations" and was "strengthening support for this strategic directive." Upon information and belief, no such board meeting occurred or was scheduled.

4902-2557-1200

20.     Greenprint warned that the shift from behind-the-meter income[3] from PG&E to merchant income was a "material change to the transaction" and asked whether fellow investor Synovus was "willing to lend against a fully merchant project." In a January 19 response, Sandor claimed Synovus "indicated they would be willing to proceed under the proposed contract."[4] In reality, Sandor had not obtained Synovus's approval. Indeed, that same day, Synovus requested a revised financial model for the Amcor Project so it could "run the numbers ASAP and offer some feedback head [sic] of your board meeting tomorrow."[5]

21.     After losing PG&E, Sandor spent 2023 scrambling to salvage the Amcor Project. He pursued new revenue sources and partnerships. For example, Sandor began working with Karbone, Inc., an advisory company that assists clients in securing revenue contracts and funding sources for developments like the Amcor Project. Sandor's urgency was not altruistic. As Nexus' largest individual shareholder, Sandor stood to gain personally from any increase in valuation and capital infusion. A high valuation meant more equity value for Sandor and more resources to sustain his compensation structure. It was against this backdrop that Sandor enticed Apricus to become Nexus' majority shareholder.

**B.      The Amcor Project's Regulatory Infeasibility and Sandor's Knowledge**

22.     In addition to revenue issues, Sandor learned that the Amcor Project could not operate as planned from a regulatory perspective. After losing PG&E, Sandor explored a partnership with Calpine, a major independent power generator, in February and March 2023. The

---

[3] Behind-the-meter energy refers to an energy source generated by a customer that first powers the customer's own needs, then any excess energy can be used by others. Regulators like CAISO call that extra energy behind-the-meter production and compensate customers for the excess energy deployed. It is a distinct program from CAISO's wholesale market for energy on the grid (also known as front of the meter).

[4] Attached hereto as Exhibit #3 are January 2023 emails between Sandor and Greenprint.

[5] Attached hereto as Exhibit #4 is January 2023 correspondence with Synovus.

4902-2557-1200

parties considered a resource adequacy agreement but conversations came to a halt when Calpine identified a regulatory hurdle with the income model.

23. Nexus intended for the Amcor Project to perform two distinct functions simultaneously: conserving and injecting energy. One component of the Amcor Project would act like a battery, injecting and consuming energy directly from the grid. That battery-type energy is called a non-generator resource ("NGR") or a "front of the meter" source because it is connected to the grid and is compensated on a wholesale, merchant basis. The second component of the Amcor Project would curtail energy use by reducing load, a function known as a proxy demand resource ("PDR"), or "behind the meter," because it offsets customers' consumption rather than injecting new energy onto the grid. Both types of energy facilities serve important roles.

24. But where Sandor went wrong was combining those functions behind the same meter. CAISO, a California energy regulator, tracks energy sources—like the Amcor Project—using a meter. A meter is a sophisticated technology and costs millions of dollars to install at an entity's site along with the necessary facilities and infrastructure to operate the meter. Energy facilities like the Amcor Project have a single meter. Once installed, the meter allows regulators to track in an NGR facility, for example, how much energy is being consumed or injected from that facility.

25. A single meter cannot be used for hybrid energy sources. CAISO pays energy developers like Nexus based on performance as indicated by the meter. If the meter cannot accurately read conservation and injection simultaneously, then CAISO cannot pay the developer according to its contributions. For that reason, CAISO will not register a site with a single meter for both NGR and PDR functions. PDR requires registration with PG&E. PG&E also will not allow two meters at the same facility. Accordingly, Sandor's plan to make the Amcor Project a

9

hybrid energy site was a regulatory impossibility because regulators would not issue the necessary registrations.

26.     Despite this, Sandor marketed the Amcor Project as capable of generating two income streams from a single meter. He falsely represented that the Project would generate income both as a PDR curtailment site and as an NGR battery site. Sandor's representations claimed this hybrid model—and the regulatory assumptions underlying it—formed the foundation of Nexus' financial projections for the Amcor Project. Sandor touted the Amcor Project to Apricus as earning both NGR and PDR income streams, projecting $2.8 million in annual EBITDA,[6] despite knowing this was impossible and intending Apricus to rely on these inflated projections in valuing Nexus. In reality, Sandor knew that CAISO would never approve such a configuration. Nexus would be forced to choose between registering the Project as an NGR or a PDR facility. Eliminating one of the two income streams would drastically reduce the Project's economic output and appeal to investors like Apricus.

27.     Sandor knew of these regulatory and EBITDA issues well before due diligence with Apricus began. Calpine identified this issue to Sandor before he was introduced to Apricus and began soliciting investment from Apricus. In an email on March 31, 2023, Calpine expressed surprise that the Amcor Project would operate as both an NGR and PDR. Calpine explained to Sandor that it understood the Amcor Project as a "WDAT" resource (a wholesale distribution access tariff or a grid-connected NGR) but had not understood the Amcor Project would also be enrolled as a PDR. In response, Sandor asked Calpine to "clarify the concern with respect to a WDAT interconnection?" Communications with Calpine ended after this revelation.[7] When talks

---

[6] Attached hereto as Exhibit #5 is Sandor's communication to Apricus.
[7] Attached hereto as Exhibit #6 are Calpine and Sandor's communications.

4902-2557-1200

with Calpine fizzled out, Karbone warned Sandor that "the nature of the battery being behind-the-meter will change the value proposition for buyers."[8]

28.     Four months later, Nexus' own contractor raised the same concern. Nexus contracted with Peak Power Energy to obtain Nexus' regulatory and related registrations and approvals for the Amcor Project from California regulators. On July 10, 2023, Scott McBrayne, Sandor's contact at Peak Power Energy, raised concerns about the Amcor Project's registrations with CAISO. McBrayne contacted Sandor after receiving a curious request to register the Amcor Project as a PDR site. CAISO rules prohibit double counting capacity in both NGR and PDR programs through a single meter at a facility. Knowing that a single-metered site could not be registered as both an NGR site and a PDR site, McBrayne flagged that doing so would change the Amcor Project from an NGR site to a PDR. This registration change would alter the asset class of the Project and the resulting income stream. Sandor initially pushed back, claiming he had provided materials showing the Amcor Project would operate as both an NGR and PDR site. McBrayne clarified that the files received from Nexus indicated the Amcor Project would be an NGR site because it would "Reg up" and "Reg down," functions only NGRs can do. The next day, Sandor acknowledged the truth. In his email to McBrayne, Sandor admitted the Amcor Project should be registered as an NGR asset since Nexus "fully intend[s] on monetizing value from Reg-Up / Reg-Down services and any failure to do so *would question the viability of the project*." In this email, Sandor chose to register the site as an NGR facility, knowing it could not serve as both an NGR and PDR site simultaneously.

29.     Peak Power's concern regarding the Amcor Project's registration was raised at internal meetings that Sandor attended. For example, at a July 17, 2023 management meeting,

---

[8] Attached hereto as Exhibit #7 is the email from Karbone.

4902-2557-1200

Sandor and others discussed that "Peak [is] advising Amcor must be registered as NGR (not PDR.).["9]

30.     Two months later, a different regulatory issue surfaced. Peak Power informed Nexus that CAISO had rejected the Amcor Project's registration because the Amcor Project was already enrolled in the Baseload Interruptible Program ("BIP"). Peak Power advised that Nexus must disenroll from BIP by November 23, 2023, to preserve any chance of CAISO registration. McBrayne stressed that "swift action with Amcor is required." Internally, Sandor admitted this was a "material item for Amcor" but instructed his team not to respond to Peak Power. Months later, on January 4, Peak Power reiterated: "CAISO will continue to reject the registration until Amcor disenrolls from BIP.["10]

31.     Contractually, Nexus could not disenroll from BIP. Nexus entered into an Energy Services Agreement with Amcor Rigid, the owner of the Amcor Project site, in February 2023. Sandor executed the agreement on Nexus' behalf. In that Agreement, Sandor committed that "[n]othing" in Nexus' Amcor Project "shall preclude or prevent [Amcor Rigid] from its continued participation in any demand response program with an applicable energy provider (including … the Base Interruptible Program (BIP) with PG&E.…)." Nexus could not disenroll the site from the PG&E's BIP program because Nexus committed in its Agreement with Amcor Rigid that the Amcor Project would not preclude Amcor Rigid from participating in BIP. This Energy Services Agreement, therefore, fundamentally prevented Nexus from obtaining any CAISO registration.

---

[9] Attached hereto as Exhibit #8 is a copy of the PowerPoint presented at this meeting.
[10] Attached hereto as Exhibits #9 - #12 are the communications from Peak Power.

4902-2557-1200

32.     Without CAISO registration, the Amcor Project could not operate as projected. As Peak Power explained throughout the summer and fall of 2023, the Amcor Project could not be registered or operated as a hybrid facility.

**C.      Development Issues Delay the Amcor Project's Operational Date**

33.     Operational breakdowns and mismanagement compounded the Amcor Project's inability to meet its promised timeline. Investor agreements committed that the Project would be operational by the end of 2023. In reality, the Project never broke ground and remains incomplete to this day. These delays were not minor setbacks; they were systemic failures that made Sandor's representations about project completion and the date of first revenue generation impossible. Three primary issues drove these operational delays.

34.     First, Nexus did not have a lease or ownership interest in the Amcor Project site. Nexus and its contractor, SunGrid, were required to obtain landlord consent before construction could begin. That consent was not secured until *September 2024*, nine months after Apricus' initial investment. Without a lease, Nexus could not legally or practically commence work, yet Sandor concealed this fact from Thuraisingham and Apricus.

35.     Second, Nexus failed to obtain the necessary building permits from local authorities and regulatory agencies. SunGrid, tasked with permitting the Amcor Project, did not submit permit applications until *October 2023*. The permits were not issued until *Spring 2024*. Without these permits, construction could not begin until Spring 2024.

36.     Third, SunGrid mishandled equipment delivery and storage, causing significant delays and catastrophic damage to critical components. Nexus spent approximately $9 million to purchase equipment and infrastructure for the Amcor Project. Equipment arrived at the site before landlord consent and permitting were secured. When the landlord refused to allow equipment to

13

remain onsite, Nexus was forced to relocate the equipment to offsite storage. During this relocation, a vital transformer necessary for the Project's operation was damaged beyond repair. This mismanagement not only destroyed essential infrastructure but also voided the warranty on the main battery system. The equipment manufacturer notified Nexus and Sandor that the hardware could not be warrantied and should not be used. As a result of the equipment damage and improper storage, Nexus defaulted on one of its financing obligations.[11]

37.    Collectively, these failures meant the Amcor Project could not meet its contractual milestones or operational commitments. These issues were so serious that Nexus initiated a confidential arbitration against SunGrid in connection with this operational mismanagement of the Amcor Project.

**D.    Sandor's Misrepresentations and Omissions to Apricus in Due Diligence**

38.    When Sandor began talks with Apricus about investing in Nexus in September 2023, PG&E had already terminated its contract with Nexus. Nexus lacked landlord consent to build the Amcor Project, had no building permits, had not started construction, could not start construction with the damaged equipment, and was not registered with CAISO. Sandor had also received multiple warnings that the Amcor Project's regulatory structure—and therefore its planned dual income streams—were impossible. Despite knowing these facts, Sandor presented a very different story to Apricus during due diligence.

39.    From September 2023 through January 2024, Apricus undertook extensive due diligence. Sandor controlled the responses and overall narrative on behalf of Nexus. Sandor and Apricus' CEO, Thuraisingham, held an introductory call on September 11, 2023,[12] followed by

---

[11] Attached as Exhibit #13 and Exhibit #14 are email communications related to these various issues.
[12] Attached hereto as Exhibit #15 is an email calendar invite for this call.

4902-2557-1200

numerous calls and meetings, including a dinner in the U.S. to discuss Apricus' potential investment in Nexus. Due diligence focused on Nexus' project portfolio and pipeline, with particular attention to the Amcor Project because it was the heart of Nexus' earning potential and liabilities due to its size.

### 1. Sandor Misrepresents the Amcor Project's Estimated Operability

40. Throughout this process, Thuraisingham repeatedly asked about the status of construction and the expected operational date of the Amcor Project. Between September and December 2023, Sandor and Thuraisingham met or spoke at least seven times—on September 26, October 6, November 15, November 20, December 1, December 8, and December 11.[13] During each of these communications, Sandor assured Thuraisingham that the Amcor Project would be operational by June 2024 or earlier. At no point did Sandor disclose that Nexus lacked landlord consent, building permits, that construction had not begun, or that SunGrid had mismanaged the Project. At the time of his discussions with Thuraisingham, Sandor knew the June 2024 date was impossible but continued to represent that date to Thuraisingham and Apricus to induce Apricus to invest.

41. Sandor provided Apricus with presentations that reinforced his false narrative. On September 26, Sandor sent Thuraisingham a PowerPoint stating the Amcor Project was "in construction" with an expected operational date of "December 2023." That same day, Sandor walked through the presentation in a meeting with Thuraisingham, reiterating that construction was underway. Sandor shared the same presentation with Thuraisingham again on October 5.[14] On December 15, Sandor sent an updated PowerPoint to Thuraisingham focused exclusively on the

---

[13] Attached hereto as Exhibit #16 are emails and calendar invites for these meetings.
[14] Attached hereto as Exhibit #17 and Exhibit #18 are emails from Sandor sharing the presentation.

Amcor Project. Sandor described the Project's "Expected Initial Delivery Date" as "May 1, 2024."[15] Sandor knew at the time these statements were made that they were false and that the Amcor Project could not be completed by that date as construction had not and could not start yet.

42.     Between January and May of 2024, Thuraisingham twice told Sandor that he wanted to visit the Amcor Project site in California as part of his due diligence. Sandor expressly discouraged him from doing so. Sandor claimed equipment issues made a visit "pointless." In reality, construction had not begun and Thuraisingham's trip would have revealed Sandor's misrepresentations—so Sandor created another lie to cover his tracks.

### 2.     Sandor Bases Projected EBITDA on the NGR/PDR Model

43.     Besides the construction timeline, Sandor represented to Thuraisingham that the Amcor Project would operate as a hybrid NGR/PDR facility. Sandor continued to represent projected EBITDA based on that dual income model, despite knowing that the model was infeasible, and did so with the intent to induce Apricus' reliance. Between September and December 2023, Sandor repeatedly explained to Thuraisingham in calls and meetings that the Amcor Project would earn income both in front of and behind the meter, resulting in $2.8 million in annual EBITDA and $1.5 million in leveraged cash flow.

44.     For example, on December 15, Sandor sent a PowerPoint presentation to Thuraisingham about the Amcor Project. This presentation memorialized the communications Sandor had with Thuraisingham in prior meetings about the Project's income streams and projected EBITDA. The presentation describes the "Purpose" of the Project as "***providing behind-the-meter services (i.e. bill savings, resiliency) to Customer, and providing front-of-the-meter services to the local electric grid operator.***" From these two income sources, the presentation

---

[15] *See* Exhibit #5.

4902-2557-1200

represents "EBITDA (10-yr avg)" at "$2.8 million / year" and "Leveraged Cash Flow (10-yr avg)" at "$1.5 million / year." Sandor knew this information was false when represented to Thuraisingham. By this time, Sandor had been informed by Calpine, Karbone, and Peak Power (multiple times) that the hybrid model (and resulting EBITDA projections) was impossible. Sandor himself admitted to Peak Power that the loss of NGR income, for example, would "***question the viability of the project***."[16]

45.     Sandor's misrepresentations during due diligence were deliberate and material. He concealed fundamental obstacles that made the Amcor Project's timeline and EBITDA projections impossible, while presenting PowerPoints and verbal assurances designed to induce Apricus to invest. At the time of these statements, Peak Power had already warned Sandor repeatedly that the site could not be registered or operated as a hybrid NGR/PDR site. By January 2024, Sandor knew the Project lacked permits, landlord consent, and regulatory clearance, yet he continued to represent the Project's operability and profitability. These omissions and false statements formed the foundation of Apricus' decision to purchase a majority stake in Nexus at an inflated valuation.

**E.     Sandor Falsifies Compensation Agreements in Response to Due Diligence Requests**

46.     During due diligence, Apricus requested Sandor's employment agreement to assess Nexus' overhead and executive compensation. In prior years, Sandor's compensation was modest and board-approved: approximately $180,096 in 2021 and $574,535 in 2022, including salary, consulting fees, and equity grants.

47.     When Apricus requested Sandor's compensation agreements in due diligence in 2023, Sandor created new "agreements"—with much more lucrative sums—out of whole cloth.

---

[16] *See* Ex. #9.

First, in early to mid-December 2023, Apricus asked Sandor for his employment agreement with Nexus. Shortly thereafter, on December 22 at 10:07 am, Sandor *created* an employment agreement for himself and sent it to Apricus that same day. To conceal this, Sandor backdated the employment agreement to May 29, 2023. Among other things, the agreement purported to grant him:

- $100,000 annual salary;

- Eligibility for discretionary bonuses and incentive pay;

- Indefinite tenure as CEO;

- A severance package guaranteeing up to 36 months of salary and three years of benefits in the event of termination without cause; and

- A severance package guaranteeing payment of all accrued compensation to date upon termination for "willful misconduct, disobedience, or willful neglect of duty."

Sandor purported to execute the agreement on behalf of himself and Nexus, without approval from the board of Nexus or any disinterested directors of Nexus. Upon information and belief, the board only became aware of this agreement after its 2025 investigation of Sandor.

48.     Upon information and belief, Sandor also created and backdated two consulting services agreements on December 22, 2023 in response to Apricus' diligence request. Sandor created a new consulting services agreement with an entity he controlled, NGG CA, for $180,000 annually. He later amended the agreement to extend the term until December 31, 2025. Sandor backdated the 2023 NGG Consulting Agreement to December 31, 2022 and the amendment to May 31, 2023.  He also created another consulting services agreement with 535723 Ontario CA, an entity whose sole director and officer was Sandor's wife, Melissa Sandor. Under this agreement, Nexus was to pay 535723 Ontario CA $15,000 per month until December 31, 2025, for a total of $465,000. Both consulting agreements contained early termination clauses requiring Nexus to pay

18

the full remaining contract value if terminated early. Under these provisions, Sandor created a golden parachute for himself wherein he would receive $360,000 annually from Nexus until December 2025 even if he were terminated early.[17]

49.     None of these agreements—the employment agreement or two consulting agreements—were reviewed by or authorized by the Nexus board or any disinterested directors of Nexus. Nexus' board did not become aware of these agreements until the subsequent investigation in 2025. Sandor executed all three agreements on behalf of Nexus. Upon information and belief, Sandor falsified these compensation documents in response to Apricus' diligence requests, with a view to enriching himself, entrenching himself as CEO, and misleading Apricus into believing that Sandor's compensation arrangements had been appropriately approved by the board of Nexus.

50.     Thuraisingham and Apricus relied on these agreements as legitimate, assuming Sandor's compensation had been handled properly and that Sandor was honest and working in the best interest of Nexus. Apricus would never have acquired Nexus had it known that its CEO and a significant shareholder was falsifying and backdating documents for his own benefit. Such self-dealing from the CEO would have abruptly ended negotiations and due diligence. Well aware of this, Sandor concealed the truth from Thuraisingham and Apricus, prioritizing his personal interests above all else.

**F.     Apricus Invests in Reliance on Sandor's Misrepresentations and Omissions**

51.     Unaware of Sandor's myriad misrepresentations about the Amcor Project's operability and EBITDA projections, or his falsification of documents, Apricus acquired a majority stake in Nexus through a series of stock purchases. The first investment closed on January

---

[17] Attached hereto as Exhibit #19 are the Consulting Agreements.

19

4902-2557-1200

29, 2024. Relying on Sandor's assurances and financial models, Apricus purchased 318,468 common shares for $9 million.

52.     After Apricus' initial investment, Sandor continued to make misrepresentations to Apricus regarding the status and projected EBITDA of the Amcor Project to induce Apricus to execute the second stock purchase as planned. For example, in January 2024, Thuraisingham was concerned about the apparent delays in construction of the Amcor Project. When Thuraisingham questioned Sandor about the Amcor Project's status, Sandor reassured Thuraisingham that the Amcor Project was facing only a two-month delay and touted that such a delay was actually "very good given market conditions of late." In response, Sandor also criticized Thuraisingham for asserting uninformed allegations of delays. Sandor chose not to disclose the permitting and landlord delays or lack of regulatory registration with CAISO.[18]

53.     Still unaware of the truth—and continuing to rely on Sandor's representations and assurances—Apricus proceeded with the second investment. On May 16, 2024, Apricus purchased an additional 1,402,340 common shares for $12,347,000, becoming Nexus' majority shareholder. At that point, Apricus obtained board representation. Soon the truth emerged: the Amcor Project was far from operable as Sandor represented. Nexus' $2.8 million EBITDA projection was a fiction. As a result, the value of Apricus' investment was dramatically less than Apricus had expected as a result of Sandor's representations.

54.     By late 2024 and into 2025, the Nexus board's concerns mounted. It launched a formal investigation into Sandor's conduct, which culminated in his termination for cause on September 26, 2025.

---

[18] Attached as Exhibit #20 is the correspondence between Sandor and Thuraisingham.

4902-2557-1200

55.    After the final purchase in May 2025, Apricus invested more than $24 million in Nexus. Had Apricus known the truth, it would never have invested—and certainly not at that price. Today, Nexus' most significant asset remains stalled, embroiled in litigation, and incapable of delivering any revenue or EBITDA, let alone the revenue and EBITDA Sandor represented to induce Apricus to invest.

## COUNT I: FRAUDULENT MISREPRESENTATION

56.    Apricus incorporates by reference the allegations of all the preceding paragraphs of this Complaint as if set forth fully herein, including, but not limited to, Paragraphs 12-32, 34-36, 39-45, 47-53, and 55.

57.    Sandor made numerous false statements to Apricus during due diligence and prior to Apricus' first investment.

58.    *First*, on multiple occasions, Sandor represented that the Amcor Project was "in construction" and would achieve commercial operation in Q4 2023 or Q2 2024, at the latest. Sandor made this representation directly to Thuraisingham in writing in a presentation he shared with Thuraisingham on September 26, 2023 and on October 5, 2023. During meetings on September 26, 2023 and October 6, 2023, Sandor made these false representations to Thuraisingham orally as well. Given the significance of the Amcor Project to Apricus' investment decision, Thuraisingham repeatedly asked about its status and construction timeline. Sandor knew this information was material to Apricus' investment decision. Sandor reassured Thuraisingham during the following meetings that the Amcor Project was in the construction phase and would be commercially operable by June 2024 at the latest: November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

59.    These statements were false. At the time Sandor made them, he knew they were false, or at minimum acted with reckless disregard of their truth. He knew Nexus lacked landlord

21

4902-2557-1200

consent, building permits, regulatory registration, and had not commenced construction. Specifically, Sandor knew, at the time he represented the Amcor Project to be "in construction" that: (1) SunGrid had not yet submitted permit applications and (2) Nexus did not own the Amcor Project site and had not yet obtained landlord consent to begin construction on the Project.  In light of these issues, Sandor knew that completing construction by the end of 2023 or second quarter of 2024 was impossible.

60.     ***Second***, Sandor represented that the Amcor Project would generate approximately $2.8 million in annual EBITDA with a leveraged cashflow of $1.5 million per year, based upon a dual-income source model. Sandor made these representations to Thuraisingham in writing on at least one occasion prior to Apricus' first investment. On December 15, 2023, Sandor sent a PowerPoint presentation to Thuraisingham about the Amcor Project, which memorialized communications between Sandor and Thuraisingham in prior meetings about the Project's income streams and projected EBITDA. The presentation described the "Purpose" of the Project as "***providing behind-the-meter services (i.e. bill savings, resiliency) to Customer, and providing front-of-the-meter services to the local electric grid operator.***" Due to these two income sources, the presentation represents "EBITDA (10-yr avg)" at "$2.8 million / year" and "Leveraged Cash Flow (10-yr avg)" at "$1.5 million / year." Sandor made similar false representations orally during meetings with Thuraisingham on November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

61.     At the time Sandor made these statements, he knew they were false, or at minimum acted with reckless disregard of their truth. Sandor knew that the Amcor Project's hybrid NGR/PDR design was a regulatory impossibility, rendering the projected EBITDA unattainable. Sandor was warned repeatedly—by Greenprint in January 2023, by Calpine in February and March

4902-2557-1200

2023, and by Peak Power on various occasions including as early as July 2023—that the Project could not be registered as both an NGR and PDR. Confronted with this information, Sandor admitted to Peak Power that the Amcor Project would have to be registered as a NGR asset, and that any other course of action "would question the viability of the project."

62.     Sandor also knew at the time these misrepresentations were made to Apricus that the project site's enrollment in the BIP program would make it impossible to obtain the CAISO registration necessary for the Amcor Project. By November 23, 2023, Peak Power had informed Sandor that the project site was enrolled in PG&E's BIP program and Nexus would need to disenroll from the BIP program to move the Amcor Project forward with CAISO. Nexus' agreement with Amcor Rigid clearly states that the project site cannot be withdrawn from the BIP program. Sandor signed the Amcor contract on behalf of Nexus and knew or should have known that a CAISO registration was impossible due to Nexus' obligation to stay in the BIP program for Amcor Rigid. Accordingly, Sandor knew the Amcor Project could not possibly attain operable status by the end of 2023 or second quarter of 2024. Despite this information, Sandor continued to make false and misleading representations assuring Apricus and Thuraisingham about the Amcor Project's operability and profitability.

63.     Sandor intended for Apricus to rely upon his misrepresentations. Sandor understood that the Amcor Project was material to Apricus' investment decision and valuation. To that end, Sandor submitted a standalone presentation to Thuraisingham focused solely on the Amcor Project. Sandor discussed the Amcor Project's importance repeatedly with Apricus' leadership and positioned it as Nexus' most significant asset, including during meetings on September 26, 2023, October 6, 2023, November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

23

4902-2557-1200

64. Sandor made these misrepresentations about the Amcor Project with the intent to induce Apricus to invest in Nexus at an inflated valuation. As the supposed "crown jewel" of Nexus' project portfolio, Sandor knew that the Amcor Project's operability timeline, EBITDA projections, and regulatory viability were material to Apricus' decision to invest and the price Apricus was willing to pay for Nexus' shares.

65. *Third*, Sandor falsified three compensation agreements and two consulting agreements in December 2023 in response to due diligence requests from Apricus. In early to mid-December 2023, Apricus asked Sandor for his employment agreement with Nexus. Shortly thereafter, on December 22 at 10:07 am, Sandor *created* an employment agreement for himself and sent it to Apricus on the same day. Sandor backdated the employment agreement to May 29, 2023. Sandor executed the agreement on behalf of himself and Nexus, without board oversight or approval.

66. Upon information and belief, Sandor also created and backdated two self-serving consulting services agreements on December 22, 2023 in response to Apricus' diligence request. Sandor created a new consulting services agreement with his entity NGG CA for $180,000 annually. He later amended the agreement to extend the term until December 31, 2025. Sandor backdated the 2023 NGG Consulting Agreement to December 31, 2022 and the amendment to May 31, 2023. He also created another consulting services agreement with 535723 Ontario CA, an entity whose sole director and officer was Sandor's wife, Melissa Sandor. Under this agreement, Nexus was to pay $15,000 per month until December 31, 2025, for a total of $465,000.

67. Sandor knew that his representations with respect to the employment and consulting agreements were false. Sandor himself had falsified them, backdated them, and failed to obtain the requisite board approvals for them. Yet, Sandor presented these compensation agreements as

24

4902-2557-1200

legitimate. Sandor surely knew that Apricus would not invest in Nexus knowing that its CEO was self-dealing and falsifying records for personal gain. Such conduct from Nexus' CEO would have ended Apricus' interest in acquiring Nexus shares.

68.   Apricus actually and reasonably relied on Sandor's statements regarding the Amcor Project and Sandor's compensation arrangements in deciding whether and how much to invest in Nexus.

69.   As a direct and proximate result of Sandor's fraudulent misrepresentations, Apricus invested in Nexus at an inflated valuation. The first investment closed on January 29, 2024. Relying on Sandor's assurances and financial models, Apricus purchased 318,468 common shares for $9 million.

70.   After the first investment closed, Sandor continued to misrepresent the Project's status and projected revenue. For example, when Thuraisingham questioned Sandor about the Amcor Project's status in January 2024 (concerned about apparent delays), Sandor reassured Thuraisingham that the Amcor Project was facing only a two-month delay and touted that such a delay was actually "very good given market conditions of late." Sandor also represented to Apricus in writing on April 15, 2024 that, at that time, the Amcor Project's CAISO registration was complete. Sandor even discouraged Thuraisingham from visiting the Amcor Project site between January and May 2024, in order to conceal his misrepresentations about the Amcor Project's operability timeline.

71.   Sandor knew these statements were false, or at minimum acted with reckless disregard of their truth. Sandor knew that the Amcor Project had not been disenrolled from BIP, and he knew that made CAISO registration a continued impossibility. Sandor knew at the time he made these representations that SunGrid had mishandled equipment delivery and storage, resulting

4902-2557-1200

in damage to essential equipment. Amcor Rigid communicated to Sandor that all onsite project activities to stop in February 2024 due to contractual issues between Amcor Rigid, Nexus, and the site landlord. In March 2024, one of the main transformers necessary for the Amcor Project's operation was dropped during delivery and significantly damaged. Sandor was aware of this incident when it occurred, and later used it as a basis to stave off financial penalties under a separate contract. Sandor knew that each of these issues would substantially delay the Project and make the represented timeline unattainable.

72. Sandor continued to make these misrepresentations about the Amcor Project with the intent to induce Apricus to invest further in Nexus, still at an inflated valuation. Sandor knew that the Amcor Project's operability timeline, EBITDA projections, and regulatory viability were material to Apricus' decision to invest additional funds, and the price Apricus was willing to pay for Nexus' shares.

73. Relying on his continued misrepresentations about the Project's status and projected revenue, Apricus purchased an additional 1,402,340 common shares for $12,347,000 on May 16, 2024, becoming Nexus' majority shareholder.

74. As a direct and proximate result of Sandor's material misrepresentations and omissions, Apricus has suffered significant harm. Had Apricus known the truth, it would not have invested in Nexus at all—or, at minimum, would have valued Nexus far less than it did as a result of Sandor's misrepresentations.

### COUNT II: NEGLIGENT MISREPRESENTATION

75. Apricus incorporates by reference the allegations of all the preceding paragraphs of this Complaint as if set forth fully herein, including, but not limited to Paragraphs 12-32, 34-36, 39-45, 47-53, and 55.

76.     Should Sandor's conduct not constitute a fraudulent misrepresentation, Apricus alternatively pleads that his conduct constitutes negligent misrepresentation.

77.     Sandor made representations regarding the status and operability of the Amcor Project, its regulatory feasibility, and its projected revenue that were in fact false.

78.     *First*, on multiple occasions, Sandor represented that the Amcor Project was "in construction" and would achieve commercial operation in Q4 2023 or Q2 2024, at the latest. Sandor made this representation directly to Thuraisingham in writing in a presentation he shared with Thuraisingham on September 26, 2023 and on October 5, 2023. During meetings on September 25, 2023 and October 6, 2023, Sandor made these false representations to Thuraisingham orally as well. Given the significance of the Amcor Project to Apricus' investment decision, Thuraisingham repeatedly asked about its status and construction timeline. Sandor reassured Thuraisingham during the following meetings that the Amcor Project was in the construction phase and would be commercially operable by June 2024 at the latest: November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

79.     These statements were false, and at the time Sandor made them, he knew or should have known that they were false. As CEO, Sandor knew or should have known that Nexus' most significant asset lacked landlord consent, building permits, regulatory registration, and had not commenced construction. Specifically, Sandor knew or should have known, at the time he represented the Amcor Project to be "in construction" that: (1) SunGrid had not yet submitted permit applications and (2) Nexus did not own the Amcor Project site and had not yet obtained landlord consent to begin construction on the Project. In light of these issues, Sandor knew or should have known that completing construction by the end of 2023 or second quarter of 2024 was impossible.

4902-2557-1200

80.     Sandor also knew or should have known at the time these misrepresentations were made to Apricus that the Amcor Project's enrollment in the BIP program would make it impossible to obtain the CAISO registration necessary to operate as planned. By November 23, 2023, Peak Power had informed Sandor that Nexus would need to disenroll from the BIP program to move the Amcor Project forward. But Nexus' agreement with Amcor Rigid clearly states that the project site cannot be withdrawn from the BIP program. Sandor signed the Amcor contract on behalf of Nexus and knew or should have known that a CAISO registration was impossible to obtain due to Nexus' obligation to stay in the BIP program for Amcor Rigid. Accordingly, the Amcor Project could not possibly attain operable status by the end of 2023 or second quarter of 2024 with these regulatory issues.

81.     ***Second***, Sandor represented that the Amcor Project would generate approximately $2.8 million in annual EBITDA with a leveraged cashflow of $1.5 million per year, based upon a dual-income source model. Sandor made these representations to Thuraisingham in writing on at least one occasion prior to Apricus' first investment. On December 15, 2023, Sandor sent a PowerPoint presentation to Thuraisingham about the Amcor Project, which memorialized communications between Sandor and Thuraisingham in prior meetings about the Project's income streams and projected EBITDA. The presentation described the "Purpose" of the Project as "***providing behind-the-meter services (i.e. bill savings, resiliency) to Customer, and providing front-of-the-meter services to the local electric grid operator.***" Due to these two income sources, the presentation represents "EBITDA (10-yr avg)" at "$2.8 million / year" and "Leveraged Cash Flow (10-yr avg)" at "$1.5 million / year." Sandor made similar false representations orally during meetings with Thuraisingham on November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

4902-2557-1200

82.     These statements were likewise false, and Sandor knew or should have known that they were false at the time he made them. Sandor knew or should have known the Amcor Project's hybrid NGR/PDR design was a regulatory impossibility, rendering the projected EBITDA streams unattainable. Sandor was told repeatedly—by Greenprint in January 2023, by Calpine in February and March 2023, and by Peak Power on various occasions including as early as July 2023—that the Project could not be registered as both an NGR and PDR. Confronted with this information, Sandor admitted to Peak Power that the Amcor Project would have to be registered as a NGR asset, and that any other course of action "would question the viability of the project."

83.     At a minimum, Sandor was negligent in making these statements because, as CEO of the developer of the Amcor Project—the company's most significant asset—he knew or should have known the Amcor Project could not be operational in June 2024 because Nexus lacked landlord consent, building permits, regulatory registrations, had inoperable equipment, and had not commenced construction. For the same reasons, he also knew or should have known that the Amcor Project could not operate in front of and behind the meter and that the Project would generate $2.8 million in EBITDA based on these income streams. Alternatively, Sandor made these statements without knowledge of their truth or falsity.

84.     ***Third***, Sandor falsified three compensation agreements and two consulting agreements in December 2023 in response to due diligence requests from Apricus. In early to mid-December 2023, Apricus asked Sandor for his employment agreement with Nexus. Shortly thereafter, on December 22 at 10:07 am, Sandor *created* an employment agreement for himself and sent it to Apricus on the same day. Sandor backdated the employment agreement to May 29, 2023. Sandor executed the agreement on behalf of himself and Nexus, without board oversight or approval.

4902-2557-1200

85.     Upon information and belief, Sandor also created and backdated two self-serving consulting services agreements on December 22, 2023 in response to Apricus' diligence request. Sandor created a new consulting services agreement with his entity NGG CA for $180,000 annually. He later amended the agreement to extend the term until December 31, 2025. Sandor backdated the 2023 NGG Consulting Agreement to December 31, 2022 and the amendment to May 31, 2023.  He also created another consulting services agreement with 535723 Ontario CA, an entity whose sole director and officer was Sandor's wife, Melissa Sandor. Under this agreement, Nexus was to pay $15,000 per month until December 31, 2025, for a total of $465,000.

86.     Sandor knew that his representations with respect to the legitimacy of agreements were false and he omitted or concealed the truth from Apricus. Sandor himself had falsified these agreements, backdated them, and failed to obtain the requisite board approvals for them. Yet, Sandor presented these compensation agreements to Apricus as legitimate. Sandor knew or should have known that Apricus would not invest in Nexus knowing that its CEO was self-dealing and falsifying records for personal gain. Such conduct by the CEO of Nexus would have ended Apricus' interest in acquiring Nexus shares.

87.     Sandor intended Apricus to rely on his representations regarding operability, regulatory feasibility, and projected revenues of the Amcor Project as well as the trustworthiness and credibility of its co-founder and CEO. Sandor knew or should have known that the Amcor Project and integrity of Nexus' CEO was material to Apricus' investment decision and valuation. To that end, Sandor submitted a standalone presentation to Thuraisingham focused solely on the Amcor Project. Sandor discussed the Amcor Project's importance repeatedly with Apricus' leadership and positioned it as Nexus' most significant asset, including during meetings on

30

4902-2557-1200

September 26, 2023, October 6, 2023, November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

88.     Sandor made these misrepresentations about the Amcor Project with the intent to induce Apricus to invest in Nexus at an inflated valuation. As the purported "crown jewel" of Nexus' project portfolio, Sandor knew or should have known that the Amcor Project's operability timeline, EBITDA projections, and regulatory viability were material to Apricus' decision to invest and the price Apricus was willing to pay for Nexus' shares.

89.     Apricus actually and reasonably relied on Sandor's statements regarding the Amcor Project and his compensation arrangements in deciding whether and how much to invest in Nexus.

90.     As a direct and proximate result of Sandor's negligent misrepresentations and omissions, Apricus invested in Nexus at an inflated valuation. The first investment closed on January 29, 2024. Relying on Sandor's assurances and financial models, Apricus purchased 318,468 common shares for $9 million.

91.     After the first investment closed, Sandor continued to misrepresent the Project's status and projected revenue. For example, when Thuraisingham questioned Sandor about the Amcor Project's status in January 2024 (concerned about apparent delays), Sandor reassured Thuraisingham that the Amcor Project was facing only a two-month delay and touted that such a delay was actually "very good given market conditions of late." Sandor also represented to Apricus in writing on April 15, 2024 that, at that time, the Amcor Project's CAISO registration was complete. Sandor even discouraged Thuraisingham from visiting the Amcor Project site between January and May 2024, in order to conceal his misrepresentations about the Amcor Project's operability timeline.

4902-2557-1200

92.     Sandor knew or should have known that these statements were false because Sandor knew or should have known that the Amcor Project had not been disenrolled from BIP, and he knew or should have known that made CAISO registration a continued impossibility. Sandor also knew or should have known that the Amcor Project had not been disenrolled from BIP, and he knew or should have known that made CAISO registration a continued impossibility.

93.     Sandor knew or should have known that each of these issues would substantially delay the Project and make the promised timeline unattainable.

94.     Sandor continued to make these misrepresentations about the Amcor Project with the intent to induce Apricus to invest further in Nexus, still at an inflated valuation. Sandor knew or should have known that the Amcor Project's operability timeline, EBITDA projections, and regulatory viability were material to Apricus' decision to invest for additional funds, and the price Apricus was willing to pay for Nexus' shares.

95.     Relying on Sandor's continued misrepresentations about the Project's status and projected revenue, Apricus purchased an additional 1,402,340 common shares for $12,347,000 on May 16, 2024, becoming Nexus' majority shareholder.

96.     As a direct and proximate result of Sandor's negligent misrepresentations and omissions, Apricus has suffered significant harm. Had Apricus known the truth, it would not have invested in Nexus at all—or, at minimum, would have valued Nexus far less than it did as a result of Sandor's misrepresentations.

### COUNT III: FRAUD BY OMISSION

97.     Apricus incorporates by reference the allegations of all the preceding paragraphs of this Complaint as if set forth fully herein, including, but not limited to Paragraphs 12-32, 34-36, 39-45, 47-53, and 55.

32

4902-2557-1200

98.     In the alternative, should Sandor's conduct not constitute fraudulent or negligent misrepresentation, Apricus pleads that his conduct constitutes fraud by omission.

99.     ***First***, on multiple occasions, Sandor represented that the Amcor Project was "in construction" and would achieve commercial operation in Q4 2023 or Q2 2024, at the latest. Sandor made this representation directly to Thuraisingham in writing in a presentation he shared with Thuraisingham on September 26, 2023 and on October 5, 2023. During meetings on September 25, 2023 and October 6, 2023, Sandor made these false representations to Thuraisingham orally as well. Given the significance of the Amcor Project to Apricus' investment decision, Thuraisingham repeatedly asked about its status and construction timeline. Sandor reassured Thuraisingham during the following meetings that the Amcor Project was in the construction phase and would be commercially operable by June 2024 at the latest: November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

100.    These statements were false, and in the course of making these statements Sandor concealed or failed to disclose certain material facts. Sandor knew or should have known that Nexus lacked landlord consent, building permits, regulatory registration, and had inoperable equipment and had not commenced construction. Sandor concealed, failed to disclose, or intentionally withheld this information from Thuraisingham and Apricus.

101.    Sandor also knew or should have known that the promised timeline for the Amcor Project was unattainable because he knew or should have known that Amcor Project's enrollment in the BIP program would make it impossible to obtain the CAISO registration necessary to become operable. By November 23, 2023 at the latest, Peak Power had informed Sandor that Nexus would need to disenroll from the BIP program to move the Project forward. However, Nexus' lease agreement with the site landlord clearly states that the lessor cannot be withdrawn

4902-2557-1200

from the BIP program. Given these contradictions, Sandor knew or should have known that a CAISO registration was impossible, or at least not easily attainable, and that the Amcor Project therefore could not possibly attain operable status by the end of 2023 or second quarter of 2024. Sandor concealed from or failed to disclose to Apricus both that Nexus' agreement with Amcor Rigid states that the project site cannot be withdrawn from the BIP program. Sandor knew or should have known that these material facts should have been disclosed to Apricus during due diligence.

102.    ***Second***, Sandor represented that the Amcor Project would generate approximately $2.8 million in annual EBITDA with a leveraged cashflow of $1.5 million per year, based upon a dual-income source model. Sandor made these representations to Thuraisingham in writing on at least one occasion prior to Apricus' first investment. On December 15, 2023, Sandor sent a PowerPoint presentation to Thuraisingham about the Amcor Project, which memorialized communications between Sandor and Thuraisingham in prior meetings about the Project's income streams and projected EBITDA. The presentation described the "Purpose" of the Project as "***providing behind-the-meter services (i.e. bill savings, resiliency) to Customer, and providing front-of-the-meter services to the local electric grid operator.***" Due to these two income sources, the presentation represents "EBITDA (10-yr avg)" at "$2.8 million / year" and "Leveraged Cash Flow (10-yr avg)" at "$1.5 million / year." Sandor made similar false representations orally during meetings with Thuraisingham on November 15, 2023, November 20, 2023, December 1, 2023, December 8, 2023, and December 11, 2023.

103.    These statements were likewise false, and Sandor knew or should have known that they were false at the time he made them. Sandor knew or should have known the Amcor Project's hybrid NGR/PDR design was a regulatory impossibility, rendering the projected EBITDA streams

4902-2557-1200

unattainable. Sandor was warned repeatedly—by Greenprint in January 2023, by Calpine in February and March 2023, and by Peak Power on various occasions including as early as July 2023—that the Project could not be registered as both an NGR and PDR. Confronted with this information, Sandor admitted to Peak Power that the Amcor Project would have to be registered as a NGR asset, and that any other course of action "would question the viability of the project."

104.    Sandor intentionally withheld and omitted this material information because it would reveal the falsity of his misrepresentations about the Amcor Project's timeline and projected revenue and would there undermine his goal of Apricus investing in Nexus. Sandor knew or should have known that his concealment of these material facts would induce Apricus to invest in Nexus.

105.    *Third*, Sandor concealed the falsification of his compensation agreements, which he had falsified, backdated, and executed on behalf of himself and Nexus. Sandor falsified three compensation agreements. First, in early to mid-December 2023, Apricus asked Sandor for his employment agreement with Nexus. Shortly thereafter, on December 22 at 10:07 am, Sandor *created* an employment agreement for himself and sent it to Apricus on the same day. Sandor backdated the employment agreement to May 29, 2023. Sandor executed the agreement on behalf of himself and Nexus, without board oversight or approval.

106.    Upon information and belief, Sandor also created and backdated two self-serving consulting services agreements on December 22, 2023 in response to Apricus' diligence request. Sandor created a new consulting services agreement with his entity NGG CA for $180,000 annually. He later amended the agreement to extend the term until December 31, 2025. Sandor backdated the 2023 NGG Consulting Agreement to December 31, 2022 and the amendment to May 31, 2023.  He also created another consulting services agreement with 535723 Ontario CA, an entity whose sole director and officer was Sandor's wife, Melissa Sandor. Under this agreement,

35

4902-2557-1200

Nexus was to pay $15,000 per month until December 31, 2025, for a total of $465,000. Sandor concealed from Apricus or purposely omitted material information regarding the legitimacy of these documents and his role in falsifying them for personal gain.

107.    Sandor knew, or at minimum should have known, that these material facts required disclosure during due diligence because the Amcor Project was Nexus' most significant asset and central to Apricus' decision to purchase shares and determine price.

108.    Sandor had actual and superior knowledge of these facts given his role at Nexus, his direct communications on these topics, and his involvement overseeing these issues on behalf of Nexus.

109.    Sandor knew his concealment of these facts would induce Apricus to invest in Nexus, as the Amcor Project was the cornerstone of Nexus' valuation and Apricus' acquisition strategy.

110.    Sandor had a duty to disclose these material facts because he made representations to Apricus about the Amcor Project's status, operability, EBITDA projections, legitimacy and circumstances of his employment agreements, and his incomplete and partial disclosures were misleading.

111.    Apricus reasonably relied on Sandor's incomplete and misleading statements and omissions to its detriment by purchasing a majority stake in Nexus at an inflated valuation. As a direct and proximate result of Sandor's omissions, Apricus invested in Nexus at an inflated valuation. The first investment closed on January 29, 2024. Relying on Sandor's assurances and financial models, Apricus purchased 318,468 common shares for $9 million.

4902-2557-1200

112. Sandor had actual and superior knowledge of these facts given his role at Nexus, his direct communications on these topics, and his involvement overseeing these issues on behalf of Nexus.

113. Sandor knew his concealment of these facts would induce Apricus to invest in Nexus, as the Amcor Project was the cornerstone of Nexus' valuation and Apricus' acquisition strategy.

114. Sandor had a duty to disclose these material facts because he made representations to Apricus about the Amcor Project's status, operability, EBITDA projections, legitimacy and circumstances of his employment agreements, and his incomplete and partial disclosures were misleading.

115. Relying on Sandor's continued misrepresentations about the Project's status and projected revenue, Apricus purchased an additional 1,402,340 common shares for $12,347,000 on May 16, 2024, becoming Nexus' majority shareholder.

116. As a direct and proximate result of Sandor's misrepresentations and omissions, Apricus has suffered significant harm. Had Apricus known the truth, it would not have invested in Nexus at all—or, at minimum, would have valued Nexus far less than it did as a result of Sandor's misrepresentations.

**PRAYER FOR RELIEF**

**WHEREFORE**, Apricus respectfully requests that the Court enter judgment in its favor and against Sandor and award the following relief:

A.    Damages, in an amount to be determined by the trier of fact;

B.    Pre- and post-judgment interest as allowed by law;

C.    Apricus' attorneys' fees, costs, and expenses; and

D.    Such other and further relief as the Court deems proper and necessary.

4902-2557-1200

**PLAINTIFF HEREBY DEMANDS TRIAL BY A JURY OF TWELVE**

Dated: January 12, 2026.                    Respectfully submitted,


                                            /s/ Charles Throckmorton
                                            Charles Throckmorton FLA Bar No. 101203
                                            Foley & Lardner LLP
                                            2 S. Biscayne Blvd., Suite 1900
                                            Miami, FL 33131-1832
                                            305.482.8400
                                            305.482.8600
                                            charles.throckmorton@foley.com

                                            Andrew J. Wronski WI Bar No. 1024029 (Pro
                                            Hac Vice Application Forthcoming)
                                            Elizabeth S. Stone WI Bar No. 1102789 (Pro
                                            Hac Vice Application Forthcoming)
                                            Olivia J. Brooks WI Bar No. 1115787 (Pro
                                            Hac Vice Application Forthcoming)
                                            Foley & Lardner LLP
                                            777 East Wisconsin Avenue
                                            Milwaukee, WI 53202-5306
                                            414.271.2400
                                            414.297.4900
                                            awronski@foley.com
                                            bstone@foley.com
                                            olivia.brooks@foley.com

                                            *Attorneys for Plaintiff Apricus Generation,
                                            Inc.*

38

4902-2557-1200